## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

Idell Dearry and Penny Green, *individually and on behalf of all others similarly situated*,

    *Plaintiffs,*

        v.

Kraken Holdings, LLC, Andrew Dunn, Joshua Bickerstaff, FactorTrust, Inc., and various John Doe Persons and Entities,

    *Defendants.*

Civil Action No. 2:21-cv-02548 (MAK)

Class Action

Jury Trial Demanded

## PLAINTIFFS' FIRST AMENDED COMPLAINT

Plaintiffs Idell Dearry and Penny Green, by and through their attorneys, on behalf of themselves and the Class defined below, allege the following based on the research of counsel, publicly available articles, reports, and other sources, a reasonable inquiry under the circumstances, and upon information and belief, except for those allegations that pertain to Plaintiffs, which are based on their personal knowledge.

## I.   INTRODUCTION

1.     Plaintiffs on their own behalf and on behalf of a proposed class of victimized consumers bring this action against Defendants and other associated, as yet unknown, persons. Defendants are being sued for their knowing participation in an illegal "payday lending" enterprise that operated over the Internet under the name of "Clarity Finance,"[1] and included an associated debt collection scheme that has persisted after the original enterprise ceased operations. Plaintiffs assert damage claims under the Racketeering Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, and under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C.. §§ 1692a-p.

---

[1] By using the term "payday lending," Plaintiffs are not referencing a technically precise or statutory term, but rather are generically referencing the high-rate small loan products that appear through the course of any Internet search for "fast" or "easy" cash loans. Included in Plaintiffs' use of this term are the short-term loans for amounts less than $1,000 that dominated the market before when these lenders operated mainly out of storefronts, as well as the larger "installment loans" that dominate the Internet market today.

2. Plaintiffs and the consumers in the putative classes were victimized by unlicensed, short-term loan products that were sold with crushing interest rates. By way of example, one of the Plaintiff's loans charged an interest rate of 407%, requiring her to pay $3,443 on a $1,100 loan in less than a year. This is more than 60 *times* the rate permitted by Pennsylvania law. These loans are originated over the Internet and promised to provide funds within a day of applying. Although this form of consumer credit is illegal under the law of Pennsylvania and most other states, well-lawyered, highly organized schemes to evade such legal restrictions have proliferated.

3. One of the most common forms of these illegal schemes has been so-called "tribal lending" schemes. In such a scheme, otherwise known as "rent-a-tribe," a lender recruits a Native American tribe to establish a tribal business entity to function as the nominal, originating lender in order to create a tribal veneer for the business. The revenues of the business flow principally to the nontribal actors that market, underwrite, and collect the loans. The illicit lender uses the veneer of tribal participation to abuse the legal doctrine of tribal sovereign immunity in an effort to insulate the usurious schemes from state regulatory authority. These schemes originate their loans over the Internet, meaning that victims sign up for these loans on their computer devices throughout the United States, that is, far from the Native American reservations where such activity purports to be taking place.

4. "Clarity Finance" was one of these lending websites. It was purportedly operated by a Native American tribe in Maine, but for all practical purposes it was in fact controlled by and for the profit of Defendants Kraken Holdings, LLC, Andrew Dunn, Joshua Bickerstaff and other nontribal persons and companies located elsewhere. Plaintiffs and the members of the putative class were Clarity Finance borrowers, many of whom continue to face the risk of illegal collection activity.

5. All online lending enterprises rely on a variety of services, some provided in-house and some outsourced, as necessary components of the business operations, including: marketing the loans to prospective borrowers, providing the technology platforms to host the lending website and to make rapid decisions on loans, payment processing services to collect the payments (usually by direct ACH debits from the borrower's bank account) and call centers to communicate with

borrowers. One of the more prominent businesses servicing this fringe financial sector is Defendant FactorTrust, Inc., which provides a host of services to payday lenders, including data aggregation, lead generation and the technical means to provide lenders the capacity to deliver nearly instantaneous credit decisions on loan applications made on lending websites.

6.      Plaintiff Dearry was ensnared in a 511% APR loan he obtained over his computer on a visit to the Clarity Finance website operated by Defendants Kraken, Dunn and Bickerstaff. One of the essential steps in the approval of Plaintiff's application for this illegal loan was a specialized "subprime" credit report that Defendant FactorTrust prepared for and delivered to Defendants Kraken, Dunn and Bickerstaff in a matter of seconds, pursuant to a complex technology structure designed and arranged for this specific purpose. Plaintiff suffered monetary damages from this illegal activity in the form of hundreds of dollars of usurious interest charges he paid.

7.      Plaintiff Green obtained a 407% APR payday loan from the same Clarity Finance website, based on a loan agreement otherwise identical to Plaintiff Dearry's. In her case, nonpayment of the loan resulted in deceptive and abusive debt collection by Defendants or by an entity likely associated with them but whose identity has been deliberately hidden. Ms. Green incurred actual damages in the form of hundreds of dollars of payments to this entity.

8.      The two Plaintiffs are filing this class action on behalf of all Clarity Finance borrowers. They are seeking treble damages under RICO and actual damages under the FDCPA, as well as attorney's fees and costs, for all payments made on these illegal loans.

## II.   THE PARTIES
### A.   Plaintiffs

9.      Plaintiff Idell Dearry is a natural person over the age of 18 who resides in Philadelphia, PA.

10.     Plaintiff Penny Green is a natural person over the age of 18 who resides in Troy, PA.

### B.   Defendants

11.     Kraken Holdings, LLC is a limited liability company with offices at 20830 N Tatum Blvd. #115, Phoenix, AZ, 85050. Kraken Holdings, LLC is not registered to do business in that

state. It is, however, registered with the Nevada Secretary of State as the manager of Soaren Management, LLC, an entity in whose name much of the underlying activity at issue here occurred.

12.     Andrew Dunn was the Chief Executive Officer of Soaren Management, LLC during the relevant time period. Upon information and belief, he resides in or around Phoenix, Arizona and/or in Nevada.

13.     Joshua Bickerstaff was the Chief Operating Officer of Soaren Management, LLC during the relevant time period. Upon information and belief, he resides in or around Phoenix, Arizona and/or in Nevada.

14.     Hereafter, Defendants Kraken Holdings, Dunn, and Bickerstaff will be referred to collectively as "the Dunn-Bickerstaff Defendants."

15.     FactorTrust, Inc. is a credit reporting agency incorporated in Delaware with its headquarters in Georgia. It is a subsidiary of TransUnion, Inc., a publicly owned company incorporated in Delaware with headquarters in Chicago, Illinois.

16.     Also named are various John Doe Defendants that have participated in the scheme, whose identities are unknown and being deliberatively hidden.

### C. Non-Defendant Interested Parties

17.     Soaren Management, LLC, which was originally named as a Defendant, was a limited liability company incorporated in Delaware with offices at 4045 Spencer St., Suite 312, Las Vegas, Nevada 89119 and 7020 E Acoma Dr., Scottsdale, Arizona 85254. However, in June 2020, Soaren was purportedly dissolved by merger into an entity associated with a Native American tribe located in California. Plaintiffs are investigating the bona fides of that merger transaction.[2] Lacking a means

---

[2] The circumstances surrounding this merger are suspicious and appear to be a calculated attempt to exploit sovereign immunity by transferring paper ownership of Soaren Management to a Native American tribe. Despite the merger, Soaren Management appears to continue to be operated by non-tribal individuals who are located in Las Vegas and Arizona—thousands of miles away from reservation land occupied by the Big Valley Band of Pomo Indians of the Big Valley Rancheria. This is a commonly used ruse. At least two other pioneers of the tribal lending model have attempted to avoid liability through the merger of their companies with tribal entities. *Williams v. Big Picture Loans, LLC*, 2020 WL 6784352 at *9-10 (E.D. Va. Nov. 18, 2020) (detailing extensive evidence regarding why a similar company was sold to a tribe "because of the threats of litigation and enforcement actions against him and his entities under the then-current lending arrangement"); *Solomon v. Am. Web Loan*,

to serve process on an LLC that purportedly no longer exists, Plaintiffs have dismissed Soaren, but without prejudice to a possible later rejoinder, after discovery.

18.     On information and belief, there are other persons or entities that have also been a part of the illegal enterprise described herein, or have provided essential services to the enterprise, with knowledge of its illegal purposes. For example, the attached Soaren website screenshots refer to Soaren as being owned by Peak Servicing, LLC, a company concerning which Plaintiffs have no knowledge. Similarly, it is likely that the alleged debt collection activity is being done by other unknown entities, either affiliated with the Defendants or acting pursuant to agreements with the Defendants. For that reason, Plaintiffs name John Doe defendants, whose current identities are unknown at this time.

## III.    JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this dispute pursuant to RICO, 18 U.S.C. § 1965, and pursuant to the FDCPA, 15 U.S.C. § 1692k. This Court also has federal question jurisdiction under 28 U.S.C. § 1331, jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), and supplemental jurisdiction over all state law claims as part of the same case or controversy under 28 U.S.C. § 1367.

20.     This Court has personal jurisdiction over Defendants because their activities that give rise to the claims in this action have been directed at and in the Commonwealth of Pennsylvania, conducted both directly and through their agents or alter egos. This Court also has personal jurisdiction over Defendants under 18 U.S. C. § 1965(b).

21.     As to Defendant FactorTrust, its presence within the Commonwealth is further evidenced by the fact that, as indicated on the website of its parent company, TransUnion, *see* printout attached as Exhibit "A," it collects file requests from consumers throughout the United States from a postal box within this District, located in Woodlyne, Pennsylvania.

---

*Inc.*, 375 F. Supp. 3d 638, 654 (E.D. Va. 2019) (detailing how a non-tribal payday lender remained in control and received the majority of the profits following the merger of his company with a tribal entity).

22. Venue is proper in this Court pursuant to 18 U.S.C. § 1965. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b) as Plaintiffs are residents of this District and a substantial part of Plaintiffs' claims occurred in Pennsylvania.

## IV. FACTUAL ALLEGATIONS

### A. Usury and Licensing Laws Generally

23. Usury laws prohibit lenders from charging borrowers excessively high rates of interest on loans. These laws have ancient origins, as usury prohibitions have been part of every major religious tradition. As Pope Francis has recently put it, "Usury humiliates and kills. Usury is a grave sin. It kills life, stomps on human dignity, promotes corruption, and sets up obstacles to the common good."[3] In the United States, every colony adopted a usury statute based on the English model.[4] This trend continued after independence, with state usury laws protecting consumers from abusive lending.

24. In addition to general usury laws, most states have adopted small-loan statutes that allow specifically defined, small-amount, loans at higher rates, conditioned on the lender obtaining a license and complying with the restrictions contained in the statute. For example, Pennsylvania has a small-loan statute that allows licensees to earn approximately 27% Annual Percentage Rate on a regulated loan that complies with statutory restrictions. *See* Consumer Discount Company Act, 7 P.S. § 6201 *et seq.* As to unlicensed lenders, on the other hand, the state's general usury law caps their permissible lending rate at 6% for unsecured loans in amounts less than $50,000. 41 P.S. § 201. *See Pennsylvania Dep't of Banking v. NCAS of Delaware, LLC,* 596 Pa. 638, 948 A.2d 752 (2008).

25. Almost all other state jurisdictions treat as illegal unlicensed small loans like those involved here. *See, e.g.,* Alabama (Ala. Code § 5-18-4); Alaska (Alaska Stat. § 06.20.310); Arizona (Ariz. Rev. Stat. § 6-613(B)); Arkansas (Ark. Code §§ 4-57-104, 105); California (Cal. Fin. Code §§

---

[3] *See* Pope Francis: "Usury humiliates and kills," Vatican News (Feb. 3, 2018), https://www.vaticannews.va/en/pope/news/2018-02/pope-francis-usury-financial-exploitation.html

[4] *See* Christopher L. Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minn. L. Rev. 1110, 1117 (2008).

22303, 22750); Colorado (Colo. Rev. Stat. § 5-2-201); Connecticut (Conn. Gen. Stat. § 36a-573;

District of Columbia (D.C. Code §§ 26-905, 28-3303); Florida (Fla. Stat. § 516.02); Georgia (Ga.

Code § 7-3-50); Hawaii (Haw. Rev. Stat. § 478-4); Idaho (Idaho Code § 28-46-402); Illinois (815 Ill.

Comp. Stat. 122/4-10); Indiana (Ind. Code § 24-4.5-5-202); Iowa (Iowa Code § 536.13); Kansas

(Kan. Stat. § 16a-5-201); Kentucky (Ky. Rev. Stat. § 286.4-991); Louisiana (La. Stat. § 9:3552); Maine

(Me. Rev. Stat. tit. 9-A, § 2-201); Maryland (Md. Code, Com. Law § 12-314); Massachusetts (Mass.

Gen. Laws ch. 140, § 119); Michigan (Mich. Comp. Laws §§ 438.32, 445.1854); Minnesota (Minn.

Stat. §§ 56.19, 334.02); Mississippi (Miss. Code. § 75-67-119); Missouri (Mo. Stat. § 408.020);

Montana (Mont. Code § 31-1-108); Nebraska (Neb. Rev. Stat. § 45-1038); New Hampshire (N.H.

Rev. Stat. § 399-A:23); New Jersey (N.J. Stat. § 31:1-1, 17:11C-32, 33); New Mexico (N.M. Stat. §

58-15-3); New York (N.Y. Gen. Oblig. Law §§ 5-501, 511, 513); North Carolina (N.C. Gen. Stat. §§

24-2, 53-166); North Dakota (N.D. Cent. Code § 13-04.1-09.2); Ohio (Ohio Rev. Code § 1321.02);

Oklahoma (14A Okla. Stat. §§ 3-201); Oregon (Or. Rev. Stat. § 725.045); Pennsylvania (41 P.S. §§

501-502); Rhode Island (6 R.I. Gen. Laws § 6-26-4); South Carolina (S.C. Code § 34-29-140); South

Dakota (S.D. Cod. Laws § 54-4-44); Tennessee (Tenn. Code §§ 47-14-110, 117); Texas (Tx. Fin. §§

302.001-004); Vermont (Vt. Stat. tit. 9, § 50); Virginia (Va. Code § 6.2-303); Washington (Wash. Rev.

Code § 19.52.020); West Virginia (W. Va. Code §§ 46A-5-101); Wisconsin (Wis. Stat. § 138.14); and

Wyoming (Wyo. Stat. § 40-14-521).

26.     Usury and licensing laws are vital public policy tools that state legislatures use to

protect consumers in their states from the predatory conduct of high-APR small-loan lenders. The

short-term, high-interest loans that usury laws regulate are targeted at the most economically

vulnerable.[5] The CFPB has found that these products tend to create cycles of high-cost borrowing

over extended periods of time; consumers find themselves caught in a "debt trap," as they take out

---

[5] *See* Mikella Hurley & Julius Adebayo, *Credit Scoring in the Era of Big Data*, 18 Yale J. L. &
Tech. 148, 174 (2016) (on the use of "alternative" credit-scores and lead generation for payday loan
vendors targeted at poor and minority communities).

additional payday loans to cover the costs of prior loans .[6] States use many policy tools to limit the proliferation of such loans, including, most commonly, limits on the maximum interest rates that can be charged and regulatory oversight through licensing regimes.

**B. Usury Law Avoidance Schemes**

27.     To avoid the statutory licensing and interest-rate limits imposed by states across the country, lenders have taken advantage of two perceived loopholes in federal law: federal bank preemption doctrine and tribal sovereign immunity.

28.     The first model under which payday lenders attempted to evade state usury laws was widely referred to as the "rent-a-bank" model. Under this model, a payday lender who is by law prohibited from making loans in a particular state attempts to evade those legal restrictions by partnering with an out-of-state bank that, for a fee, acts as the nominal lender while the *de facto*, non-bank lender markets, funds and collects the loan, and performs most other lender functions.

29.     Because banks are insulated from state examination and regulation by virtue of federal bank pre-emption doctrines, many payday lenders were, for a period of time, able to operate openly from storefronts, using these "rent-a-bank" arrangements to evade enforcement in states where, like Pennsylvania, payday lending is illegal under state law. However, beginning in 2005, the Federal Deposit and Insurance Corporation (hereinafter "FDIC") began to crack down on its regulated banks' participation in such "rent-a-bank" arrangements with payday lenders. *See* FDIC, Guidelines for Payday Lending, FIL-14-2005.

30.     Despite the FDIC guidance, due to the continuing profits available to banks and payday lenders that offer high-interest, short-term loan products in states where payday lending was formally prohibited, rent-a-bank schemes continued to proliferate in the shadows. The United States Department of Justice (hereinafter "DOJ") also began combating "rent-a-bank" schemes through an initiative that targeted financial intermediaries such as banks that rented their names to payday

---

[6] *See* Consumer Financial Protection Bureau, White Paper: Payday Loans and Deposit Advance Products, at 43-44 (Apr. 24, 2013).

lending schemes and other financial scams. *See* Jessica Silver-Greenberg, *Justice Department Inquiry Takes Aim at Banks' Business with Payday Lenders*, N.Y. TIMES (Jan. 26, 2014), *available online.*

31.　Following the regulatory crackdowns on the rent-a-bank schemes led by the FDIC and the DOJ, online lenders in the early 2010s shifted to a new usury law avoidance model: the "rent-a-tribe" model. While, unlike banks, Native American tribes have no special legal status as lenders, they do enjoy general sovereign immunity from state law enforcement actions. *See, e.g., Michigan v. Bay Mills Indian Community*, 572 U.S. 782 (2014). In a rent-a-tribe scheme, a non-tribal lending enterprise attempts to assume vicariously the protections of a sovereign nation and legitimize their otherwise illegal business by way of this tribal veneer.

32.　Under the rent-a-tribe model, the online lender contracts with a Native American tribe to originate loans in the name of a tribal entity, with that entity acting as the nominal lender. Generally, the tribal entity retains only nominal ownership of the loans, with most of the beneficial ownership being transferred to a non-tribal entity. In return, the tribe receives a small share of the profits generated, while the nontribal entity directing the scheme extracts most of the profits as payment for "services" provided to the lender.

33.　The use by payday lenders of tribal veneers as an artifice to evade state law has been widely publicized. *See, e.g.*, H.R., Committee on Financial Services, Dem. Staff Report, "Skirting the Law: Five Tactics Payday Lenders Use to Evade State Consumer Protection Law," June 16, 2016, at 15 ("Renting Sovereign Immunity"); Carter Dougherty, "Payday Lenders and Indians Evading Laws Draw Scrutiny," Bloomberg, June 5, 2012; Jeff Guo, "Many States Have Cracked Down on Payday Loans. Here's How Lenders Still Get Away with It," Washington Post, February 9, 2015.

34.　These illicit lenders have formed trade associations to attempt to bring respectability to their illegal activity and to lobby for legitimizing legislation. One of these, the Online Lenders Alliance, was founded, and until recently led, by Mark Curry, the millionaire lender behind the American Web Loan "tribal" lender. *See Solomon v. Am. Web Loan*, 4:17CV145 (E.D. Va.) (recently approved class action settlement against AWL and Curry) Another, the Native American Financial Services Association, was first organized by Think Finance, Inc., the now bankrupt Texas payday

lending company that ran three "tribal" lending websites. *See In re Think Finance, Inc.,* Case No. 33964-HDH11 (Bankr. N.D. Tex.).[7]

35.     The Federal Government has obtained highly publicized criminal convictions under RICO against two payday loan kingpins who used "rent-a-tribe" arrangements to attempt to evade state usury law. On October 13, 2017, a jury in the U.S. District Court for the Southern District of New York convicted Scott Tucker and his attorney, Timothy Muir, on all fourteen felony counts brought against them. *United States v. Tucker*, No. 1:16-cr-00091-PKC (S.D.N.Y.).[8]  On November 27, 2017, a jury in this District convicted Charles M. Hallinan and his attorney, Wheeler K. Neff, on seventeen felony counts. *United States v. Hallinan*, No. 2:16-cr-00130-ER (E.D.Pa.).[9]

36.     Civil suits brought both as civil law enforcement actions brought by state attorneys general and as private actions have similarly demonstrated the fragility of the sovereign immunity defense, particularly when actions are brought against the payday lending entities that are the real parties of interest in the "rent-a-tribe" scheme. *See, e.g., Commonwealth of Pennsylvania v. Think Fin., Inc.*, 14-CV-7139, 2016 WL 183289, *3-8 (E.D. Pa. Jan. 14, 2016) (tribes not indispensable parties to state-analogous RICO action brought by the Pennsylvania attorney general against non-tribal businesses operating a supposedly "tribal" lending enterprise); *Solomon v. Am. Web Loan*, 4:17CV145, 2019 WL 1320790, at *20-22 (E.D. Va. Mar. 22, 2019) (tribes not indispensable parties in private RICO action brought for unlawful debt collection); *see also Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105 (2d Cir. 2014) (rejecting suit brought by tribes to challenge New York attorney general's enforcement of state usury laws against rent-a-tribe schemes).

---

[7] The CEO of Think Finance, Ken Rees, was also a long-time board member of the Online Lenders Alliance.

[8] *See* Press Release, United States Department of Justice, Scott Tucker and Timothy Muir Convicted at Trial for $3.5 Billion Unlawful Internet Payday Lending Enterprise (Oct. 13, 2017), *available online.*

[9] *See* Press Release, United States Department of Justice, Two Men Found Guilty of Racketeering Conspiracy in Payday Lending Case (Nov. 27, 2017), *available online.*

37. These criminal and civil actions have also shed light on the role played in tribal lending schemes by other service providers. *See, e.g. Pennsylvania by Shapiro v. Think Fin., Inc.,* No. 14-CV-7139, 2018 WL 637656 (E.D. Pa. Jan. 31, 2018) (in enforcement action under state law version of RICO, denying motion to dismiss by hedge fund that provided lending capital to a tribal lending scheme); *United States v. Intercept,* Case No. 2:17-cr-00491-ER (E.D. Pa. 2017) (guilty plea by payment processor that assisted tribal lending scheme.).

### C. Defendants' Lending Activities through the Pine Tree Lending Enterprise

38. The payday loans at issue in this suit were offered through the Clarity Finance website at https://www.clarityfinance.com, which no longer is live. The earliest copy of the homepage available on the "Wayback Machine," from January 2020 (a copy of which is attached as Exhibit "B"), states that "Pine Tree Lending LLC dba Clarity Finance ("Clarity"), is a wholly-owned and operated limited liability company subsidiary of Indian Township Enterprises, a sovereign economic arm, enterprise and instrumentality of, and created under the laws of and for the benefit of, the Passamaquoddy Tribe of Indian Township ("Tribe"), a federally-recognized sovereign American Indian tribe," and states that all decisions on loan applications are made at the lender's office at 8 Kennebasis Road, Indian Township, ME 04668 "on the Tribe's reservation."

39. However, a look under the hood shows that these representations were sham pretenses. For instance, the "chatbot" on the Clarity Finance website, which provides consumers with immediate access to a purported customer service representative for Clarity Finance, was operated by the Dunn-Bickerstaff Defendants. This is evident in the HTML source code of the home page, whose chatbot script source links to https://omniflex.soarenmanagement.com/v1/AirlineFlexCustomerIframe.js? updated=20200514-2. *See* attached Exhibit "C" (lines 446-448).

40. The Dunn-Bickerstaff Defendants also operated the portal where borrowers managed their account. This is evident in the HTML source code of the login page (www.clarityfinance.com/login) where "Soaren Management" is identified in the meta data as the "author" of the login applet. *See* attached Exhibit "D" (line 16 extension).

41.     Furthermore, trying to find any evidence of the Tribe's involvement in the lending enterprise outside of the website and the loan agreements is a fool's errand. A search of both the Tribe's own website, http://www.passamaquoddy.com/, and the Tribe's Facebook page, https://www.facebook.com/indtwptribe/, returns zero results for "Clarity Finance," "Pine Tree Lending," "loan," or "lending." A search for almost all other supposed tribal entities mentioned on the loan agreement and the Clarity website also return zero search results. Such untraceable, paper entities include the "Tribal Financial Services Regulatory Authority," which, according to the loan agreements, supposedly arbitrates consumer disputes; the "Tribal Consumer Financial Services Regulatory Authority," which supposedly regulates consumer financial services for the Tribe including the issuance of financial service licenses; and "Indian Township Enterprises," which is supposedly the economic arm of the tribe under which Pine Tree Lending is a subsidiary corporation.

42.     In reality, Pine Tree Lending d/b/a Clarity Finance was a "rent-a-tribe" scheme directed and operated by the Dunn-Bickerstaff Defendants. Under this scheme, payday loans were made in the name of a lender affiliated with the Tribe, but the Defendants, or entities with whom they contracted, provided the infrastructure to market, fund, underwrite and collect the loans.

43.     Among other things, the Dunn-Bickerstaff Defendants produced the customer leads; managed the technology platform, including the loan decisioning process; supplied the capital to make the loans; and managed the payment-processing and collection mechanisms used to obtain payments from consumers, including the sale of nonperforming loans to debt-buyers. Upon origination, the loans themselves, or a beneficial interest in the loans, would be transferred to a non-tribal entity in which, upon information and belief, the Defendants had an interest or affiliation.

44.     On the website for Soaren Management—which, despite Defendants' assertion of Soaren's nonexistence, appears to be very much alive—the company describes itself as "a Fintech company that helps lenders service the complete life cycle of their short-term loans. From lead qualification to collecting past-due payments, we can handle every human and automated contact

needed to service our clients' financial products." *See* https://www.soarenmanagement.com/about/. (Copy attached as Exhibit "E.")

45. Soaren Management's website, on a "What We Do" page, further advertises that it offers the following services: (1) "loan portfolio management," including "full service loan underwriting, loan verification, and loan origination solutions," (2) "customer support," including "inbound/outbound call center, online chat services, and application verification," (3) "turn key lending solutions," i.e., ready to operate "lending products from lead qualification to past-due collections," (4) "asset retention," including "collection of past-due and at-risk accounts," (5) "proprietary loan management software," which allows for "efficient loan management" to "improve portfolio performance," and (6) "marketing" and "lead gen[eration]," including "website development, email marketing, and lost-lead retargeting." (Copy attached as Ex. "F").

46. Upon information and belief, the Dunn-Bickerstaff Defendants directed each of these activities described above over the "complete life cycle" of loans originated on the Clarity Services website—and none of these activities were overseen or conducted by the Tribe or its representatives.

47. During the relevant time period, one of the operations centers for Soaren Management was at 20830 N. Tatum Blvd., Suite 115, Phoenix AZ 85050, which was also the registered address of Defendant Kraken Holdings, LLC, Soaren's manager.

48. In short, the lending activity that is designed to appear to be business conducted by a Native American tribe is, in actuality, a business enterprise directed by non-tribal Defendants that extracted most of the generated revenue, while creating a tribal veneer designed to hide their direction of the business. Upon information and belief, much of the revenue is likely disguised as fees for services provided by the Dunn-Bickerstaff Defendants, and even the net earnings, after these "services" are paid for, are, for the most part, diverted to the non-tribal purchasers of the loans.

49. Indeed, contrary to the front portrayed in the loan agreements, Defendant FactorTrust, whose involvement in the loan approval process is described below, identifies "Soaren

Management" as the lender on Plaintiff Dearry's loan. *Compare* Exhibit "G" (credit report identifying Soaren Management under column "Lender Name," but otherwise including all the details regarding Plaintiff Dearry's loan with Pine Tree Lending, such as December 20, 2018 as the "date opened"). Similarly, FactorTrust's credit report further reveals that Soaren Management—not Pine Tree Lending—obtained Plaintiff's credit report on December 20, 2018. *Id.* .

50.     FactorTrust's identification of "Soaren Management" as the lender on the loan and as the user of the report is significant because federal law requires consumer reporting agencies to adopt procedures to investigate the prospective users of their reports, including procedures requiring the user to "identify themselves, certify the purposes for which the information is sought, and certify that the information will be used for no other purpose." 15 U.S.C. § 1681e(a).

51.     Meanwhile, the Dunn-Bickerstaff Defendants have taken steps to actively conceal their participation and involvement in this "rent-a-tribe" scheme. For instance, they purchased a website privacy service from Domains by Proxy for the web domain www.clarityfinance.com. This service ensures that anyone attempting to identify the owner of the website will be directed to a proxy agent instead of an actual agent of the owner, so that the Dunn-Bickerstaff Defendants cannot be identified as the owners of the website.

52.     Soaren Management and Defendant Dunn have been identified in other litigation alleging similar "rent-a-tribe" schemes where they were alleged to have been the true lenders in a payday lending enterprise operating behind a tribal façade in an attempt to avoid state usury laws. *See* Complaint, *Beckford v. Niibin*, Case No. 8:20-cv-02718, at ¶¶ 71-73 (M.D. Fla. Nov. 18, 2020); Complaint, *McIntosh v. Target Finance, LLC*, Case No. 2021-SC-000029, at ¶ 32 (Fla.,Pasco Cty. Cir. Ct.) (alleging, inter alia, that "Soaren, Kraken, and Dunn are the real owners of the Target Cash Now lending enterprise, and they pocket the vast majority of profits" with another tribe "receiving a little under 2 cents on each dollar of revenue.").

53.     Defendant Bickerstaff has been involved in running "rent-a-tribe" schemes for at least a decade. According to his LinkedIn profile, from Jan. 2011 until Mar. 2015 he was involved in

"Business Development" for Fresh Start Marketing, LLC, Atlas Intelligence, LLC, and DesTel, LLC. Defendant Bickerstaff describes the services these entities offered as:

> **Fresh Start Marketing, LLC** – a "service company for a online tribal lending portfolio" that was created "expressly to create and manage online and offline marketing campaigns to generate responsive leads in the online micro-lending space."

> **Atlas Intelligence, LLC** – a "service company for a online tribal lending portfolio" that was created "with three key objectives: create and administer a dynamic underwriting process to accurately predict lifetime customer value and provide loan approval recommendations in accordance with established revenue goals, curate all aspects of consumer data management and business analytics, and provide company executives with concise reporting on portfolio performance as well create and implement new strategies to achieve established goals."

> **DesTel, LLC** – a "service company for a online tribal lending portfolio" that was created "expressly to manage all call center operations associated with loan verification, origination, collections and direct marketing."

54.    Each of those limited liability companies were part of a constellation of entities centered around Encore Services, LLC—owned and run by Zachary Roberts, Martin Mazzara, and Richard Lee Broome—that acted as the actual payday lending operation behind various "rent-a-tribe" enterprises. Fresh Start and DesTel, along with Encore and the principals, were in fact sued by a tribal client for fraud related to a rent-a-tribe scheme. *See Chippewa Cree Tribe of the Rocky Boy's Reservation of Montana v. Roberts*, CV 14-63-GF-BMM, 2015 WL 9239764 (D. Mont. Dec. 17, 2015). A criminal prosecution followed in which Roberts, Mazarra, and Encore were convicted for the fraud, with both individuals sentenced to prison terms. *United States v. Encore Servs., LLC*, GF-16-19-GF-BMM-JTJ (D. Mont. Feb. 21, 2017).[10]

55.    Upon information and belief, the Dunn-Bickerstaff Defendants were responsible for designing, organizing, and implementing all facets of the payday lending operation that offered usurious loans over the "Clarity Finance" website.

---

[10] *See* Press Release, United States Department of Justice, Las Vegas Businessmen Sentenced to Prison in Montana Public Corruption Case (Aug. 25, 2017), *available online.*

**D. Defendant FactorTrust's Role in the Scheme**

56.     One of the critical components of the lender functions performed by the Soaren technology platform used by the Dunn-Bickerstaff Defendants was the automated decisioning technology used to render rapid decisions on loan applications made over "tribal" websites such as Clarity Finance. In order to render nearly instantaneous loan approvals, the loan decisioning system requires a complex technology connection to the computer system of a third-party, specialized consumer reporting agency, that can quickly assess the credit risk of the loan applicant and communicate that assessment back to the loan decisioning platform.

57.     Defendant FactorTrust was, at least for a period of time that Clarity Finance loans were being made, the specialty consumer reporting agency that, pursuant to a contractual arrangement with the Dunn-Bickerstaff Defendants, was providing this essential service to them. Through the technology integration services described above, a loan application made on the Clarity Services website would automatically trigger an electronic transmission to FactorTrust, containing personal information about the applicant collected during the application process. In a matter of seconds, FactorTrust would scan its database containing, among other things, information about prior payday lending, and return to the Dunn-Bickerstaff platform the credit risk assessment needed to render an automated approval or denial.[11]

58.     In short, FactorTrust was not simply supplying credit reports to a lender that was using the reports as part of an independent loan underwriting process, but rather, was an essential participant in an elaborate, integrated technology network, established and maintained by the Defendants. Within this technology network, the personal information contained in loan applications initiated on the "Clarity Services" website—falsely represented to the applicant as being a tribal lending operation taking place on tribal lands—was automatically transmitted to FactorTrust.

---

[11] By referring to the technology platform as the Dunn-Bickerstaff platform, Plaintiffs do not wish to imply that the Defendants here devised all the technology themselves. More likely is that they licensed one of the third-party platforms, such as "Provenir," that are used to power most of the illegal websites operating currently.

The FactorTrust side of the network, in turn, would respond with a nearly instantaneous transmission, sending credit-risk information to "Soaren Management," the company which it knew to be the actual lender.

59.     This imbedding by FactorTrust into the "Clarity Services" decisioning platform operating by "Soaren Management" was not accidental or incidental to its business model; on the contrary, FactorTrust's core mission has, from its inception, been to service payday lenders such as the Dunn-Bickerstaff Defendants, many of whom have been actively engaged in deliberate efforts to circumvent state law.  Indeed, in deposition testimony rendered in a different matter, FactorTrust's Vice President of Sales testified that his company's focus when it launched was "servicing the online payday guys."

60.     In a 2016 interview published on the website of Provenir, one of the vendors of the technology platforms used by online lenders, FactorTrust's CEO, Greg Rable, explained, "Integration into the systems that lenders use is essential."  He boasted that, through the use of its proprietary database containing information about 200 million consumer transactions with "alternative" lenders, it was able to evaluate the credit risk and return a score to an online lender "in around a second to a second and a half." A copy of this interview is attached hereto as Exhibit "H."[12]

61.     At the time of that interview, Rable was a member of the Board of Directors of the Online Lenders Alliance, serving alongside several of the leading proponents of the "rent-a-tribe" lending model. *See* Paragraph 34, *supra*. He was also a donor to the organization's political action committee.

62.     Moreover, as mentioned above, being a "consumer reporting agency," FactorTrust operates under a federal statutory duty requiring it to maintain procedures for identifying the

---

[12] *See also* the results of a web search for "FactorTrust" that links to the "Short-Term Lending" page of the website of FactorTrust's parent company, TransUnion, offering, among other things, the means to "[p]ower underwriting models." (A copy of that "Short-Term Lending" page is attached as Exhibit I.)

businesses to whom it provides credit reports on loan applicants. 15 U.S.C. § 1681e(a). Upon information and belief, in compliance with this obligation, FactorTrust, knew the Dunn-Bickerstaff Defendants and the nature of the business they were conducting, including the exorbitant rates that they were charging to consumers.

63. Indeed, in its contracting, FactorTrust routinely reserves the right to scrutinize the business of its customers to ensure that they meet "credentialling standards . . . which may include periodic physical inspection of Customer's premises, audit of Customer's business records relating to the Services, third-party Investigation of Customer and personal Interviews with Customer's officers and employees." Master Services Agreement, ¶ 13.1 (filed document 97-5, in *FactorTrust, Inc. v. Evanston Ins. Co.*, No. 1:16-cv-02711-LMM (N.D. Ga.).

64. Upon information and belief, FactorTrust performed such credentialing of the Dunn-Bickerstaff Defendants consistent with its customary business practices, leading to its identification of "Soaren Management" as the "lender" of these loans. Further, FactorTrust knew— through this credentialing and through its awareness of rent-a-tribe arrangements—that Soaren Management was providing illegal loans to consumers and using FactorTrust's services as an essential component of the lending operation.

**E. Plaintiffs' Loans from Pine Tree Lending**

**Plaintiff Dearry**

65. On or about December 20, 2018, Plaintiff Dearry visited the Clarity Services website from his device in Pennsylvania and applied for a loan, inputting his private, personal information including his Social Security number and his bank account information.

66. Within seconds, unbeknownst to him, the Dunn-Bickerstaff platform automatically transmitted a credit inquiry about him to FactorTrust, which, in turn, in a matter of seconds, and pursuant to an agreement between the Dunn-Bickerstaff Defendants and FactorTrust, returned a credit report to Soaren Management.

67. Plaintiff Dearry discovered this when, in response to a request for his credit file, FactorTrust disclosed that, on December 20, 2018—*i.e.*, the date of the Clarity Services loan—it

provided a credit report to a lender it identified as Soaren Management LLC, at the address of 20830 N. Tatum Blvd., Suite 115, Phoenix, AZ 85050, *i.e.* the registered address of Kraken Holdings, LLC. (Exhibit "G").

68.     Based on that credit report, the Dunn-Bickerstaff platform approved a loan to Mr. Dearry and, that same day, December 20, 2018, a Clarity Finance loan was issued to him. The loan, effective December 21, 2018, was in the amount of $1,000, with an Annual Percentage Rate of 511%, and provided for monthly payments totaling $4,130.88, to be paid over the course of one year. (A copy of this loan agreement is attached as Exhibit "J.").

69.     Over the course of the following three months, in accordance with an automatic payment protocol arranged and managed by the Dunn-Bickerstaff Defendants, approximately $1,377 was debited from his bank account via ACH transfer.

**Plaintiff Green**

70.     On or about May 3, 2018, Plaintiff Green went to the Clarity Finance website from her device in Pennsylvania and applied for a loan, inputting her private, personal information including her Social Security number and her bank account location and number.

71.     Based on a credit report it obtained for her, the Dunn-Bickerstaff platform approved a loan to Ms. Green in the amount of $1,100, and, on or about that same day, a Clarity Finance loan was issued to her. The loan, effective May 6, 2018, was in the amount $1,100, with an Annual Percentage Rate of 408%, and provided for $4,543.92, to be paid over the course of a year.  (A copy of the Green loan agreement is attached as Exhibit "K.").

72.     On or about June 3, 2019, in accordance with an automatic payment protocol arranged and managed by the Dunn-Bickerstaff Defendants, a first loan payment of $378.66 was automatically withdrawn from Ms. Green's bank account via ACH transfer.

73.     At some point, Ms. Green managed to stop the automatic payments from her bank account, pursuant to her rights under the Electronic Funds Transfer Act, 15 U.S.C. § 1693e.

74. Sometime thereafter, Ms. Green began receiving automated collection calls that bombarded her home multiple times daily, at all hours of the day. This went on from late 2019 into early 2021.

75. At first, she accepted these calls and, although she received little information about who was calling, she made small monthly payments that, over time, added up to roughly $500. As directed by the phone calls, she made these payments via the ACH system.

76. She eventually stopped these payments but has continued to receive these frequent robocalls.

77. Ms. Green has no idea who is initiating these calls. Most recently, these calls have come from the numbers 844-501-0546, 484-341-7348, and 610-708-1864.

78. The unknown entity that is making these constant, repetitive automated calls to Ms. Green is deliberately trying to hide its identity in plain violation of 15 U.S.C. § 1692d(6) (requiring "meaningful disclosure of the caller's identity" when collecting debts). Upon information and belief, the Clarity Finance website is no longer making loans, so this entity is likely associated with the Dunn-Bickerstaff Defendants who are continuing to try to extract whatever they can from Plaintiff and similarly situated "Clarity Finance" victims.

### The Illegality of the Plaintiffs' Loans

79. Absent a state license to make certain kinds of regulated loans, no one may make an unsecured loan for $50,000 or less to a resident of the Commonwealth of Pennsylvania at an annual percentage rate greater than 6%. 41 Purdons Pa. St. § 201.

80. At the time Plaintiffs Dearry and Green obtained their "Clarity Finance" loans, neither Pine Tree Lending nor any other Defendant had obtained a consumer finance license from the Commonwealth of Pennsylvania.

81. Upon information and belief, neither Pine Tree Lending nor any other Defendant had obtained a consumer finance license from any of the other jurisdictions included in the class; and no Defendant has ever attempted to obtain such a license in connection with loans made in the name of Pine Tree Lending.

82.     Under Pennsylvania law, if a lender is not exempt from the 6% interest rate cap and has not obtained a consumer finance license, and nonetheless contracts to make a consumer loan and charges, contracts for, or receives interest or other compensation in excess of 6% per year, then any interest in excess of 6% per year is deemed to be null and void and the lender is not permitted to collect on it. 41 Purdons Pa. St. §§ 501-502.

83.     Plaintiffs' loans were unlawful and void under Pennsylvania law. The 407.67% interest rate charged Ms. Green was more than 67 times greater than the maximum allowable interest rate; the 511% charged Mr. Dearry was more than 85 times the legal limit.

**F.  Purported Arbitration Clauses in Plaintiffs' Loan Agreements Are Void and Unenforceable**

84.     Pine Tree Lending's purported lending agreements—which were, upon information and belief, drafted by or for the Dunn-Bickerstaff Defendants—not only violated the usury laws or applicable interest rate caps in the borrowers' home state, they included unconscionable choice of law and arbitration provisions that unlawfully sought to disclaim the application of federal and state law and impose the law of the Tribe as the sole governing law.

85.     The language in the form Pine Tree Lending loan agreement stated the following regarding the applicable governing law:

> **GOVERNING LAW**: The laws of the Tribe and applicable federal law will govern this Agreement, without regard to the laws of any state or other jurisdiction, including the conflict of laws rules of any state. You agree to be bound by Tribal law, and in the event of a bona fide dispute between you and us, Tribal law shall exclusively apply to such dispute.

86.     This is in addition to the second paragraph of the Pine Tree Lending loan agreement, which simply read: "This Agreement is governed by the laws of the Tribe."

87.     Through these provisions, the Pine Tree Lending loan agreement purported to disclaim and waive federal and state rights that cannot be waived by consumers.

88.     The Pine Tree Lending loan agreement also included an arbitration provision which it described as a "**TRIBAL DISPUTE RESOLUTION PROCEDURE PROVISION**" (the "Purported Arbitration Clause"). This provision purported to provide exclusive jurisdiction to the

complaints department of Clarity Finance, with additional review provided by a supposed "Tribal Financial Services Regulatory Authority." No other information besides an address was given for this purported "Authority." The address given is 8 Kennebasis Rd., Indian Township, ME, 04668. This is the same exact address as the address given in the loan agreement for Clarity Finance itself. There are no other indicia that the "Authority" which supposedly will arbitrate any dispute is in any way distinct from Clarity Finance, the party against which any claim might be brought.

89.     Determinations of that entity could supposedly be appealed to an entity called the "Tribal Court" for which there was no further definition, address, or means provided to find more information about the entity. There are no indicia that the "Tribal Court" is, as a matter of either form or substance, distinct from the purported "Authority."

90.     The mechanisms described in the Purported Arbitration Clause provide no option for third-party, neutral arbitrators that have no interest in the dispute. Indeed, in the loan agreement Pine Tree Lending both purports to be an "economic arm of the tribe" while reserving exclusive jurisdiction to the tribe to resolve consumer complaints. ("It is the express intention of the Tribe and us operating as an economic arm of the Tribe, to fully preserve, and not waive either in whole or in part, exclusive jurisdiction, sovereign governmental immunity, and any other rights, titles, privileges, and immunities, to which we and the Tribe are entitled;" "**THIS DISPUTE RESOLUTION OPPORTUNITY IS INTENDED AS THE SOLE DISPUTE RESOLUTION MECHANISM FOR DISPUTES AND CLAIMS ARISING UNDER THIS LOAN AGREEMENT**." (emphasis in original)).

91.     Upon close examination, the Purported Arbitration Clause is more notable for what it did not contain than for what it did contain. In addition to providing no neutral arbiter or neutral means to appeal the decision, the Purported Arbitration Clause did not guarantee the consumer a right to an in-person hearing, did not guarantee that any hearing that took place would be accessible to the consumer, and did not provide a means to opt-out of the clause.

92.     Although "the Authority may offer the consumer an opportunity to be heard," this right was exclusively reserved for the "Authority" to offer. There was no reference to where the

rules or procedure of the "appellate" Tribal Court might be found, or even any indication of where the supposed court itself sits or who comprises it.

93.     The Purported Arbitration Clause is unconscionable and unenforceable for the same reasons articulated by the U.S. Court of Appeals for the Third Circuit in *MacDonald v. CashCall, Inc.* 883 F.3d 220 (3d Cir. 2018) and by courts in the Eastern District of Pennsylvania in *Smith v. Western Sky Financial, LLC* 168 F.Supp.3d 778 (E.D. Pa. 2016), and *Ryan v. Delbert Servs. Corp.*, 5:15-CV-05044, 2016 WL 4702352 (E.D. Pa. Sept. 8, 2016).

94.     Specifically, the Purported Arbitration Clause is invalid because "the arbitral forum provided for in the Loan Agreement is nonexistent." *MacDonald,* 883 F.3d at 227.

95.     Furthermore, "[a]n arbitration clause that 'purports to renounce wholesale the application of any federal law to [a plaintiff's] federal claims ... is simply unenforceable.'" *Ryan,* 2016 WL 4702352, at *4 (quoting *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 673-674 (4th Cir. 2016)).

96.     The additional indicia of substantive and procedural unconscionability including the lack of impartial arbitrators, the lack of meaningful process of appeal, the lack of in person hearings, the lack of a local forum, and the lack of a meaningful opportunity to opt-out of the arbitration agreement further emphasize the extent to which the Purported Arbitration Clause is a naked and deliberate attempt to avoid the application of federal and state law through the use of unconscionable choice of law and arbitration provisions. The use of arbitration as a means of circumventing the application of federal and state law, particularly in a law avoidance scheme like the one engaged in by Defendants here, is not permitted under controlling law in this judicial circuit.

97.     Moreover, under controlling authority in this Circuit, no part of the unlawful Purported Arbitration Clause may be severed to preserve the remainder of Defendants' integrated scheme to contravene public policy. *See MacDonald,* 883 F.3d at 230-232.

98.     Plaintiffs are therefore entitled to a declaratory judgment that the governing law, forum selection, and Purported Arbitration Clause provisions of the Pine Tree Lending loan agreements are unenforceable in their entirety.

## V.    CLASS ALLEGATIONS

99.    Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rules of Civil Procedure Rule 23(a) and 23(b)(l), (b)(2), and (b)(3), as representatives of the following Class:

> All persons who obtained loans from Pine Tree Lending d/b/a Clarity Finance from the beginning of the period commencing four years prior to the filing of this action, who, at the time the loan was made, were residents of any states or the District of Columbia, other than Nevada or Utah, and who made payments on such loans.

100.    This action is brought, and may properly be maintained, as a class action pursuant to Rule 23. This action satisfies the numerosity, typicality, adequacy, predominance, and superiority requirements of those provisions. The members of the Class are readily ascertainable from records maintained by Defendants.

101.    **Numerosity**. Members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs, Plaintiffs believe that there are likely tens of thousands of individuals who are members of the Class. The exact number of Class members and their identities are known by Defendants or are readily ascertainable in Defendants' records.

102.    **Typicality**. Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs' claims are based on the same facts and legal theories as each of the members of the Class. Plaintiffs and all Class members were charged interest rates on online payday loans obtained through the Clarity Finance website that exceeded the lawful interest rate caps in their states of residence. Plaintiffs and all members of the Class were damaged by the same wrongful conduct of Defendants in connection with the operation of the above-described online lending scheme.

103.    **Adequacy**. Plaintiffs will fairly and adequately protect the interests of the Class. The interests of Plaintiffs are coincident with, and not antagonistic to, those of the other members of the Class. Plaintiffs have retained counsel that are competent and experienced in the prosecution of complex class action litigation and have experience with class action litigation involving tribal lending schemes. Plaintiffs' counsel will undertake to vigorously protect the interests of the Class.

104. **Commonality & Predominance**. Questions of law and fact are common to the members of the Class and predominate over any questions that may affect only individual Class members. The claims of all Class members originate from the same misconduct and violations of law perpetrated by Defendants. The common questions include, but are not limited to:

a. Whether the PTL Lending Organization (defined below) is an enterprise under 18 U.S.C. § 1961(4);

b. Whether the Dunn-Bickerstaff Defendants engaged and/or are engaging in the collection of unlawful debt in violation of 18 U.S.C. § 1962(c);

c. Whether Defendant FactorTrust conspired with the PTL Payday Lending Organization in violation of 18 U.S.C. § 1962(d);

d. Whether the Dunn-Bickerstaff Defendants and the unknown entities who are attempting to collect these illegal loans are violating the Fair Debt Collect Practices Act, 15 U.S.C. §§ 1692d, 1692e, 1692f, & 1692g.

e. Whether the purported arbitration agreement in Plaintiffs' and the Class' loan agreements is void and/or unenforceable; and

f. Whether Defendants are liable to Plaintiffs and members of the Class for damages or other relief.

105. **Superiority**. Under Rule 23(b)(3), class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common, small-dollar claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would entail. The benefits of proceeding through the class mechanism, including providing injured persons with a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

106.     This action is also maintainable as a class action under Rule 23(b)(2) because Defendants have acted on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

107.     With respect to Rule 23(b)(1)(B), the prosecution of separate actions by each Class member would create a risk of adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests. Class action status is also warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.

108.     Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

**VI.     CLAIMS FOR RELIEF**

**COUNT ONE**
**RICO, 18 U.S.C. § 1962(c) – Collection of Unlawful Debt**
**(Against Defendants Kraken, Dunn and Bickerstaff)**

109.     Plaintiffs reassert and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

110.     At all relevant times, Defendants Kraken Holdings, Dunn and Bickerstaff were members and associates of an online lending enterprise operating on the Internet as Pine Tree Lending, LLC d/b/a Clarity Finance (the "PTL Lending Organization"), whose members and associates engaged in the collection of unlawful debt.

111.     The PTL Lending Organization, including its leadership, membership, and associates, constitutes an "enterprise" as that term is defined in 18 U.S.C. § 1961(4) - that is, a group of individuals and entities associated in fact. This association in fact shared a common purpose (the direction and management of the Clarity Finance lending business); relationships among those associated ("Soaren Management" or some other named, affiliated entity being the entity running the business in its capacity as a purported "servicer" hired by the nominal lender and, itself, in these

activities being managed by Kraken, Dunn and Bickerstaff); and a longevity sufficient to originate and collect thousands of illicit loans. Other unnamed participants in the association in fact include the as-yet unclear newly merged version of Soaren Management, LLC, and other, as yet unknown John Doe entities that have been involved in the described debt collection activities.

112.    The enterprise has been engaged in, and its activities affected, interstate commerce. The PTL Lending Organization has leadership based in Arizona and Nevada and has been operating throughout the United States, including the Eastern District of Pennsylvania.

113.    The PTL Lending Organization constitutes an ongoing organization whose members function as a continuing unit for a common purpose of achieving the objectives of the enterprise.

114.    The PTL Lending Organization has been led, controlled, and/or managed by Defendants Kraken, Dunn and Bickerstaff and the purpose of the said enterprise was and continues to be the enrichment of the said Defendants through the collection of unlawful debt.

115.    RICO defines an "unlawful debt" as debt incurred in connection with "the business of lending money or a thing of value at a usurious rate under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

116.    The means and methods by which the Defendants conducted and participated in the conduct of the affairs of the PTL Lending Organization was the operation, direction, and control of a business of lending money at usurious rates more than two times the legal limit in Pennsylvania and the other forty-nine jurisdictions listed in Paragraph 25, above.

117.    The said Defendants have violated RICO through the "collection of unlawful debt," as that term is defined in RICO, 18 U.S.C. § 1962(c), from consumers throughout the United States,

118.    As a result of the unlawful collection of illegal debt, Plaintiffs Dearry and Green and members of the Class have been injured in their property through the payments made to the Defendants.

119.    As a direct and proximate cause of the Defendants' violations of RICO, they are jointly and severally liable to Plaintiffs and the putative members of the Class for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**C**OUNT **T**WO
**RICO, 18 U.S.C. § 1962(c) – Interstate Wire Fraud**
**(Against Defendants Kraken, Dunn and Bickerstaff)**

120.     Plaintiffs reassert and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

121.     The PTL Lending Organization described above has been engaged in activities which affect interstate commerce, more specifically, in collection activity directed against consumers throughout the United States who entered into loan transactions over the Clarity Finance website.

122.     The Defendants have participated in the conduct of the affairs of that enterprise through a "pattern of racketeering activity," as that phrase is defined in 18 U.S.C. § 1961(5).

123.     The collection activity described above constituted the execution of a scheme and artifice to obtain revenues by means of fraudulent pretenses and representations through the use of the interstate wire network, in violation of 18 U.S.C. § 1343.  Defendants' use of the telephone wire network formed a central feature of the scheme and included, by way of example and as described above, a system of repetitive robocalls, sent from disguised numbers and directed to consumers such as Plaintiff Green, who had taken out and not repaid the "Clarity Finance" loans arranged by Defendants. In addition, Defendants had consumers such as Plaintiff Green use the ACH wire system to send payments to them.

124.     The conduct described above constituted multiple violations of 18 U.S.C. § 1343, which is a predicate offense for purposes of 18 U.S.C. § 1962(c).

125.     The unlawful conduct by the Defendants alleged above, conducted through the PTL Lending Organization, injured numerous victims, was continuous and open ended and was intended to continue, and indeed, it does continue today.

126.     Plaintiffs and the members of the class were the intended targets of the scheme that was facilitated by the knowing and purposeful involvement of the RICO Defendants.  The financial harms suffered by plaintiffs and members of the class were the direct result of said conduct and were the intended and reasonably foreseeable consequence of such conduct.

Pursuant to 18 U.S.C. § 1964(c), Plaintiffs and the members of the class are entitled to threefold the damages they sustained, together with reasonable attorney's fees and costs.

**COUNT THREE**
**RICO, 18 U.S.C. 1962(d) – RICO Conspiracy**
**(Against ALL Defendants)**

127.    Plaintiffs reassert and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

128.    Besides the PTL Lending Organization described above, Pine Tree Lending LLC, doing business as Clarity Finance, was also an "enterprise," as defined in 18 U.S.C. § 1961(4).  The conduct of the Dunn-Bickerstaff Defendants, with knowledge, agreeing to support and assist, and in fact, supporting and assisting the illegal loan business described above, violated 18 U.S.C. § 1962(d).

129.    Defendant FactorTrust knew that the PTL Lending Organization was using its services to further a "rent-a-tribe" scheme and thereby facilitate decisions on high-rate, small loans that it knew or should have known were illegal in Pennsylvania and in nearly every other state.

130.    Defendant FactorTrust, with knowledge that the PTL Lending Organization made and collected unlawful debts and was engaged in a pattern of racketeering activity, purposely and knowingly agreed to assist and facilitate this unlawful activity by providing an essential component of the loan decisioning process.

131.    Defendant FactorTrust knew or should have known that the true lender to whom it supplied the credit reports at issue, which it identifies as "Soaren Management," was in actuality a sham tribal lending enterprise operating behind a "tribal" façade.

132.    The acts of Defendant FactorTrust were purposefully and knowingly directed at facilitating a criminal pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

133.    Various as-yet unknown John Doe Defendants, with knowledge that the PTL Lending Enterprise, have also been facilitating this illegal activity, including those involved in the purported merger transaction with Soaren Management and those who are collecting the unlawful

debts, originated by the Enterprise, with knowledge of their illegality, in violation of 18 U.S.C. §
1962(d).

134. As a result of this violation of RICO, Defendants are jointly and severally liable to
Plaintiff and the putative members of the Class for all the damages caused by the PTL Lending
Enterprise, including hundreds of millions of dollars in illegal interest paid, treble damages, costs,
and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

### COUNT FOUR
### FDCPA, 15 U.S.C. §1692k
### (Against Defendants and John Doe Entities)

135. Plaintiffs reassert and incorporate by reference each of the preceding paragraphs as if
set forth fully herein.

136. The consumer debt created by the above-described lending enterprise is "debt"
within the meaning of the Fair Debt Collections Practices Act ("FDCPA"), 15 U.S.C. § 1692a(5).

137. Under the FDCPA, the term "debt collector" means any person who uses any
instrumentality of interstate commerce or the mails in any business the principal purpose of which is
the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly,
debts owed or due or asserted to be owed or due another.  15 U.S.C. § 1692a(6).

138. Whoever it is that has been robocalling Plaintiff Green and similarly situated class
members—whether the named Dunn-Bickerstaff Defendants or a third party John Doe that is
deliberately hiding its identity— is a "debt collector."

139. During the year preceding the commencement of this action, the Defendants and/or
said John Doe have engaged in multiple violations of the FDCPA, including the following:

    a. Defendants violate 15 U.S.C. §1692e(2)(A) by misrepresenting the character,
amount, and legal status of the debt;

    b. Defendants violate 15 U.S.C. §1692e(14) by using a business, company, or
organization name other than the true name of the debt collector's business, company,
or organization;

c.     Defendants violate 15 U.S.C. § 1692f(1) by collecting or attempting to collect amounts clearly not owing under state law;

d.     Defendants violate 15 U.S.C. § 1692d(5) by causing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number.

e.     Defendants violate 15 U.S.C. § 1692d(6) by placing telephone calls without meaningful disclosure of the caller's identity.

f.     Defendants violate 15 U.S.C. § 1692g by systematically failing to provide the validation notice required by that section, which failure adds to the unfair and deceptive nature of Defendants' communications.

140.     Plaintiff Green and the members of the class suffered actual damages from these violations, namely the amounts they paid to Defendants.

141.     Pursuant to 15 U.S.C. § 1692k, Plaintiff and the class members are entitled to actual damages, and reasonable attorney's fees and costs.

### COUNT FIVE
### Unjust Enrichment
### (Against ALL Defendants)

142.     Plaintiffs reassert and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

143.     Defendants have been unjustly enriched by their continued possession of funds illegally taken from Plaintiffs and members of the Class who were experiencing financial difficulties and taken advantage of through the Pine Tree Lending online payday lending scheme.

144.     In equity and good conscience, those funds collected in excess of the legal rate of interest permitted by Class members' home states should be returned to the people victimized by Defendants' unlawful scheme.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class, respectfully seek the following relief:

A. Certification of this action as a class action and appointing Plaintiffs and their counsel (listed below) to represent the Class;

B. A finding that the Defendants have violated § 1962(c) of RICO through the collection of unlawful debt;

C. A finding that the Defendants have violated § 1962(c) of RICO through a pattern of wire fraud;

D. A finding that Defendants have violated § 1962(d) of RICO through their conspiracy to facilitate the collection of unlawful debt and/or the pattern of wire fraud;

E. A finding that Defendants have violated 15 U.S.C. §§ 1692d-1692g through their illegal debt collection conduct;

F. A finding that Defendants have been unjustly enriched through their participation the describe scheme;

G. Treble damages under 18 U.S.C. § 1964.

H. Actual damages under 15 U.S.C. § 1692k and under the common law;

I. An order awarding attorneys' fees and costs; and

J. An award of any such other and further relief that the Court deems just and proper.

### JURY DEMAND

Plaintiffs demand trial by jury of all issues so triable.

Respectfully submitted,

/s/ *Irv Ackelsberg*
Irv Ackelsberg
John J. Grogan
LANGER, GROGAN & DIVER, PC
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703
Email: iackelsberg@langergrogan.com

Kristi C. Kelly (admitted *pro hac vice*)
Andrew J. Guzzo (admitted *pro hac vice*)
J. Patrick McNichol (admitted *pro hac vice*)
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
kkelly@kellyguzzo.com

Dated: October 14, 2021